**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HANOVERIAN, INC. et al.,** | : | |
| | : | |
| **Plaintiffs** | : | **Civil Action No. 1:07-cv-00658** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **ENVIRONMENTAL PROTECTION,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the court are the Pennsylvania Department of Environmental Protection's motion

to remand the above-captioned action to the Pennsylvania Environmental Hearing Board

(Doc. No. 6) and its motion for sanctions, including attorney's fees incurred in connection with

the removal of the action, against Hanoverian, Inc., Donald Metzger, the 200 Cascade Drive

Ordinary Trust, plaintiffs' counsel Donald Litman, and the law firm of Edwards and Litman with

which Donald Litman is affiliated (Doc. No. 20).  For the reasons that follow, the Court will

grant the motion to remand, deny the motion for sanctions with respect to Hanoverian, Inc.,

Donald Metzger, and the 200 Cascade Drive Ordinary Trust, and grant the motion for sanctions

with respect to Donald Litman and the law firm of Litman and Edwards.

**I.      BACKGROUND**

In 1981, the Pennsylvania Department of Environmental Protection ("Department")

issued a solid waste permit ("Permit") to Quaker Alloy Casting Company ("Quaker Casting") for

a landfill at 200 East Richland Avenue in Myerstown, Pennsylvania ("Landfill").  (Doc. No. 9-3,

at 5.)  The Department modified the permit on several occasions thereafter, most notably on

September 29, 1986, to authorize the transfer of the Landfill's ownership from Quaker Casting to

Quaker Alloy, Inc., (Id., at 12) ("Quaker Alloy") and on July 5, 2000, to allow captive processing

of residual waste (Id., at 24; see also id., at 26).  The application (id., at 30, 37) for the latter

modification identifies the applicant as "Quaker Alloy, Inc." and includes Quaker Alloy's

employer and taxpayer identification numbers (id., at 31, 37).

### A.     The Bankruptcy Proceedings

On August 4, 2003, Atchison Casting Corporation ("Atchison") and twelve of its

domestic subsidiaries, including Quaker Alloy, ("Debtors") filed voluntary petitions for Chapter

11 bankruptcy relief in the United States Bankruptcy Court for the Western District of Missouri

("Bankruptcy Court").  (Doc. No. 9-5; see also Doc. No. 9-7, at 3.)  Quaker Alloy's petition

identifies the debtor as "Quaker Alloy, Inc." and, like the application for the July 2000

modification, includes Quaker Alloy's taxpayer identification number.  (Id., at 2.)  That same

day, the Bankruptcy Court issued an order authorizing the joint administration of the Debtors'

cases, and directing that all pleadings be filed at the docket number for the Atchison case.

(Doc. No. 9-6, at 2.)  On January 15, 2004, the Bankruptcy Court entered an order authorizing the

sale of Quaker Alloy's assets ("Sale Order") (Doc. No. 9-10), and, one week later, appointed

Erlene Krigel ("Krigel") as the trustee in bankruptcy for the Debtors (id.).

The Sale Order authorized the sale of Quaker Alloy's remaining assets subject to, inter

alia, the following terms and conditions:

> C.     The sale of the Assets shall be free and clear of liens and all
> other claims whatsoever pursuant to section 363(f) of the Bankruptcy
> Code, whether known or unknown, including, but not limited to, any
> existing right(s) of first refusal or similar protective right alleged by
> any party, except as specifically referenced herein, any liens and
> claims of any of the Debtors' creditors, vendors, supplies, employees
> or lessors, and the buyers shall not be liable in any way for any claims

that any of the foregoing or any other third party may have against the Debtors or the Assets. Any and all alleged liens and claims on such Assets shall be transferred, affixed, and attached to the proceeds of the sale, with the same validity, priority, force, and effect as such liens had been upon the Assets immediately prior to the sale.

E.     Subject to the payment by the buyer(s) to Debtors of the purchase price for the Assets, the sale of the Assets by the Debtors to the buyer(s) shall constitute a legal, valid and effective transfer of the Assets and shall vest buyer(s) with all right, title, and interest of the Debtors in and to the Assets, free and clear of all liens pursuant to section 353(g) of the Bankruptcy Code.

(Doc. No. 1-7, at 27-28.)  At a public auction held March 23, 2004, Hanoverian, Inc.

("Hanoverian") submitted the winning bid of $540,000 for the Landfill.  (Doc. No. 27, at 8;

Doc. No. 27-2, at 2; Doc. No. 1-4, at 9.)  On April 8, 2004, Linda Houseal, the solid waste

supervisor at the Department's Southcentral Regional Office, informed Thomas Marks, an

environmental consultant in the employ of Hanoverian, that, pursuant to Pennsylvania law, the

Department would require any purchaser of the Landfill to obtain a permit reissuance and bond

the Landfill.  (Doc. No. 9-3, at 4.)  Krigel sold the Landfill to Hanoverian by a quitclaim deed

dated April 9, 2004.  (Doc. No. 1-7; Doc. No. 1-4, at 11.)

Sometime after purchasing the Landfill, Hanoverian contacted Krigel and expressed an

interest in purchasing the corporate name of "Quaker Alloy, Inc." ("Corporate Name").  See In re

Atchison Casting Corp., No. 03-50965, Trustee's Motion for Order Authorizing Sale of

Corporate Name, at 2 (Bank. W.D. Mo. June 30, 2004).  On June 30, 2004, Krigel moved the

Bankruptcy Court for authorization to sell the Corporate Name to Hanoverian for $1,500.  Id.

The Bankruptcy Court subsequently issued an order authorizing the sale (Doc. No. 1-4, at 21),

and, by a bill of sale dated August 3, 2004, Krigel transferred "unto Hanoverian, Inc., Trustee for

the 200 Cascade Drive Ordinary Trust . . . all of Seller's right, title and interest in and to the corporate name of Quaker Alloy, Inc." (Id., at 25).  As the Department observes in its brief, neither the order nor the bill of sale contemplate "the sale of the corporation known up until that time as 'Quaker Alloy, Inc.' or the sale of any rights that corporation had under the Permit." (Doc. No. 9, at 10.)  On August 9, 2004, the Debtor previously known as "Quaker Alloy, Inc." filed a notice with the Bankruptcy Court indicating that "it ha[d] changed its corporate name to Quaker Administration, Inc., such name change being occasioned as a result of the sale of the Debtor's corporate name to Hanoverian, Inc., Trustee for the 200 Cascade Drive Ordinary Trust . . . ."  (Doc. No. 1-4, at 23.)

**B.      The Environmental Hearing Board Appeals**

On April 24, 2006, Hanoverian's general counsel Craig Edwards ("Edwards") sent a letter to the Department's assistant counsel James Bohan ("Bohan") in which he stated:  "With regard to the ownership of [the Landfill], the deeded owner is Hanoverian, Inc. as trustee.  The landfill parcel is being transferred to Quaker Alloy, Inc. (which was a name obtained from the bankruptcy trustee). . . . To my knowledge, as [t]rustee for the 200 Cascade Drive Ordinary Trust, Hanoverian, Inc. is not required to be registered to do business in Pennsylvania." (Doc. No. 1-10, at 17.)  Fifteen days later, the Department sent a letter to Krigel, notifying her that the Permit had been revoked "[b]y virtue of Quaker Alloy, Inc.'s . . . dissolution, and Quaker Alloy abandoning the permitted facility without providing for final closure."  (Doc. No. 9-4, at 5.)  The Department sent a copy of the letter to Quaker Alloy at its address of record in Myerstown, Pennsylvania, that same day.  (Id., at 3, 8.)  Two days later, the letter to Quaker Alloy came back to the Department marked "not deliverable as addressed; unable to forward."

4

(Id.)  In addition to the letters, the Department published notice of the revocation in the July 29, 2006, issue of the *Pennsylvania Bulletin*.  (Doc. No. 9-20, at 2.)

### 1. The Permit Revocation and Bond Forfeiture Appeals

On August 28, 2006, Hanoverian filed a notice of appeal with the Pennsylvania Environmental Hearing Board ("EHB") challenging the Department's decision to revoke the Permit ("Permit Appeal").  (Doc. No. 1-5, at 6.)  In early September, the Department declared the bond for the Landfill, submitted by "Quaker Alloy, Inc." in 1986, forfeited and proceeded to collect thereon.  (Doc. No. 9-3, at 15; see also id., at 22; Doc. No. 1-5, at 17.)  On October 4, 2006, the Department served Hanoverian with its first set of interrogatories and first request for production of documents in connection with the Permit Appeal.  (Doc. No. 9-16.)  A good number of the interrogatories questioned Hanoverian's authority to do business in Pennsylvania, either under the name "Hanoverian" or under fictitious names with the words "Quaker" or "Alloy."  In particular, the Department requested that Hanoverian:

> 1.  Please list each state: (a) In which Hanoverian has been incorporated as well as the date of incorporation in each state.  (b) In which Hanoverian is legally qualified to conduct business.
> . . .
> 2.  Please list all trade or other names under which Hanoverian has done business from the date of [Hanoverian's] incorporation to the present; and the state(s) in which Hanoverian has done business under each name.
> . . .
> 8.  In what state(s) does Hanoverian contend that it is doing business as "Quaker Alloy"? . . . If Hanoverian contends that it is doing business as "Quaker Alloy" in Pennsylvania, please:  (i) State the factual basis for this contention.  (ii) Identify all persons with knowledge or information supporting this contention.  (iii) Identify any and all documents containing information relevant to this contention.

(Doc. No. 9-16, at 5, 6, 8.)  On November 15, 2006—forty-two days after serving Hanoverian with its first interrogatories—the Department filed a motion to compel discovery with the EHB. (Doc. No. 9-17, at 2.)  Five days later, Hanoverian filed a notice of appeal with the EHB, contesting the forfeiture of the bond ("Bond Appeal").  (Doc. No. 1-5, at 12.)  On November 22, 2006, Hanoverian filed an application for a certificate of authority (Doc. No. 9-21) and an application for registration of the fictitious name "Quaker Alloy" (Doc. No. 9-22) with the Corporations Bureau of the Pennsylvania Department of State.  Edwards executed both applications in his capacity as Hanoverian's general counsel.  (Doc. No. 9-21, at 3; Doc. No. 9-22, at 3.)

### 2.    The Administrative Order and the Articles of Amendment

On December 7, 2006, the EHB issued two orders, one granting the Department's motion to compel discovery (Doc. No. 1-8) and another consolidating Hanoverian's appeals under the docket number for the Permit Appeal (Doc. No. 9-17, at 3).  That same day, the Department issued an administrative order ("Administrative Order") to Hanoverian and its president Donald Metzger ("Metzger") (Doc. No. 9, at 15), for past and ongoing violations at the Landfill, namely, owning and operating the Landfill without first obtaining a permit reissuance or submitting a bond, and failing to implement an approved closure plan or a provide adequate sampling and analysis (Doc. No. 9-24, at 10-12).  Litman responded to the order in a letter sent to Bohan the following week, wherein he asserted, among other things, that "Quaker Alloy, Inc. *is no longer the* [sic] *bankrupt entity*, as Quaker Alloy, Inc. (along with all right title [sic] and interest of the name—including the permit) belongs to my client, Hanoverian, Inc." and "Quaker Alloy is alive and well . . . ."  (Doc. No. 1-8, at 22.)

6

On December 26, 2006, Edwards filed articles of amendment to Quaker Alloy's articles of incorporation—more precisely, the articles of incorporation filed by a Missouri attorney in 1994—with the Pennsylvania Corporation Bureau.  (Doc. No. 9-23, at 2, 10.)  In the filing form that accompanied the articles, Edwards indicated that Quaker Alloy's registered office was "c/o Hanoverian, Inc." in Coopersburg, Pennsylvania, (id.) and attested that "[t]he amendment was adopted by the board of directors pursuant to 15 Pa. C[ons]. S[tat]. § 1914(c)" (id.).  The first two articles provide as follows:

> QUAKER ALLOY, INC.
> (formerly known as the Atchison Casting Corp.)
> As amended pursuant to the sale from the United States Trustee Erlene W. Krigel to conform with the provisions of the Order of the US Bankruptcy Court in the matter of IN RE ATCHISON CASTING CORP., No. 03-50965-jwv7
> US Bankruptcy Ct., WD Missouri (Copy attached)
> These Articles of Amendment were approved by majority vote of the Board of Directors and sole shareholder Donald C. Metzger on April 29, 2005; a quorum was present at such meeting; the amendment received at least two-thirds of the votes entitled to be cast at such meeting.
> The undersigned, the president and secretary of the corporation known as the [sic] "Quaker Alloy, Inc." and each being a natural person of the age of 21 years or more, does hereby verify and file these Articles of Amendment pursuant to the Pennsylvania Business Corporation Law of 1988.
> ARTICLE OF AMENDMENT I
> The name of the corporation shall be "Quaker Alloy, Inc." and Article I is hereby amended to delete all prior names, and the new name includes the usage of "Quaker Alloy" as the name of the corporation.
> ARTICLE OF AMENDMENT II
> The following provisions shall be substituted to Article V of the Articles of Incorporation and inserted in its stead:
> The Corporation shall have the following officers:
> Donald C. Metzger  PRESIDENT, SECRETARY & TREASURER
> 1930 Rt. 309
> Coopersburg, PA 18036
> Bucks County

(<u>Id.</u>, at 12.)  A third article of amendment restructured the capitalization of the corporation from

"1,500,000 shares of Common Stock consisting of 1,000,000 shares of Class A Common Stock,

$1.00 par value per share, and 500,000 shares of Class B Non-voting Common Stock, $1.00 par

value per share" (<u>id.</u>, at 7) to "one class of stock: 100,000 shares [at] $0.10 Par Value" (<u>id.</u>, at

12).  Edwards executed the filing form (<u>id.</u>, at 11) and Metzger executed the articles of

amendment (<u>id.</u>, at 12).

### 3.      The Order Appeal

On January 8, 2007, Hanoverian, Metzger, and the 200 Cascade Drive Ordinary Trust

("Trust"), of which Hanoverian is the sole trustee (Doc. No. 1-9, at 19), filed a third notice of

appeal with the EHB ("Order Appeal"), charging that the Department "has been engaged in

unlawful conduct under federal bankruptcy law by taking adverse actions contrary to the

automatic stay pursuant to federal law against the bankruptcy entity Quaker Alloy, Inc., without

first obtaining the allowance of court in the matter of IN RE ATCHISON CASTING

CORP. . . . in accordance with 11 [U.S.C.] § 362(d)," (Doc. No. 1-5, at 21-22).  The unlawful

conduct, appellants allege, includes "unlawfully, willfully and deliberately commenc[ing] to

revoke [the Permit] and forfeit the bond without affording any direct notice to Appellee, but [sic]

ch[oosing] instead to forward the same to the bankruptcy trustee" and "ch[oosing] instead to

engage in a slanderous public press release that improperly impugned the reputation, name and

character of the Appellants and the bankrupt entity." (<u>Id.</u>, at 22-23.)  Appellants further charge

that "Donald Metzger as a beneficiary is not a proper party to this matter, and preliminarily

objects pursuant to the Pennsylvania Rules of Civil Procedure to being named in [the

Administrative] Order, and moves herein to be dismissed with prejudice pursuant to

[Pa. R. Civ. P.] 1028." (Id., at 23.)  Lastly, Hanoverian individually objects, without further

explanation, "to the Administrative Order of the Department, because said action deprives said

Appellant of their [sic] due process rights as equitable owner of the permit." (Doc. No. 1-5,

at 25.)  On January 12, 2007, the EHB issued an order consolidating all three appeals under the

docket number for the Permit Appeal.  (Doc. No. 9-19, at 2-3.)

### C.    Plaintiffs' Notice of Removal

On April 9, 2007—ninety-one days after the Order Appeal had commenced—Litman

filed a "Notice of Removal of State Court Action to U.S. District Court" and civil cover sheet

with the Middle District Clerk of Court.  (Doc. Nos. 1, 1-2.)  Both documents name the same

four plaintiffs, here listed in full for the sake of accuracy, but hereafter referred to as "Plaintiffs"

for the sake of convenience:  Hanoverian, Inc. dba Quaker Alloy, Quaker Alloy, Inc., 200

Cascade Drive Ordinary Trust, and Donald Metzger.  (Doc. No. 1, at 1; Doc. No. 1-2, at 2.)  The

disclosure statement appended to the notice of removal avers that the "Petitioner, Hanoverian,

Inc., a Delaware Corporation, is a nongovernmental corporate party herein that is not publicly

traded, and is the parent corporation of Quaker Alloy, Inc., a Pennsylvania Corporation, which is

not publicly traded." (Doc. No. 1, at 6.)  The business entity filing history for Quaker Alloy, Inc.,

provided by the Corporations Bureau and filed as an exhibit to the notice of removal, gives an

entity creation date of April 11, 1994, and lists Dinny Kinloch of 200 Richland Avenue,

Myerstown, Pennsylvania, as president and Kevin McDermed of the same address as secretary

and treasurer.  (Doc. No. 1-11, at 18.)

In the cause-of-action section of the civil cover sheet, Plaintiffs cite § 363 of the

Bankruptcy Code, 11 U.S.C. § 363, as the basis for bringing suit and, by way of further

explanation, state that the "PA DEP has violated US Bankruptcy law by asserting claims against

sold [sic] under Order of the Bankruptcy Court (WD Missouri) that were not asserted by claim or

adversary proceeding in the Bankruptcy Court."  (Doc. No. 1-2, at 1.)  The notice of removal,

however, states otherwise:

> [P]laintiffs ("collectively referred to as Quaker Alloy"), through its
> undersigned counsel, hereby files [sic] this Notice of Removal
> pursuant to 28 U.S.C. § 1452(a) and Federal Rule of Bankruptcy
> Procedure 9027(a).  Quaker Alloy hereby removes to the Middle
> District Court of Pennsylvania all claims and causes of action in the
> state action styled Hanoverian, Inc. Et Al [sic] v. Pennsylvania De-
> partment of Environmental Protection EHB Docket Nos. 2007028,
> 2006256, and 2006192, now pending in the Pennsylvania
> Environmental Hearing Board (the "State Court Action").

(Doc. No. 1, at 1-2.)  Plaintiffs' principle claim upon removal is that the Department "engaged in

unlawful actions in violation of the US Bankruptcy Court Orders and federal law by taking

actions against the Petitioner concerning [the Permit] that were required to be raised before the

Bankruptcy Court before the authorized sales to Petitioner" and, "[a]lthough [the Department]

failed to object or otherwise file an adversary proceeding against Quaker Alloy, Inc., for the

intended sale of the landfill and permit, . . . in April 2006 [the Department] notified incorrectly

the US Trustee only of their [sic] intention to forfeit the bond on [the Permit], and failed to notify

the Plaintiffs."  (Id., at 3-4.)  Fundamental to Plaintiffs' claim are the allegations that "[w]ithout

objection or condition of the [Department], in 2004 the United States Trustee for Quaker Alloy,

Inc. obtained approval from the US Bankruptcy Court to liquidate the assets of Quaker Alloy,

Inc., including scheduled bank deposits constituting a collateral bond of $27,125 relating to [the

Permit]" and that "[i]n July 27, 2004 pursuant to US Bankruptcy Court order, the US Trustee

sold all the right, title and interest to the corporate entity Quaker Alloy, Inc. to the

Plaintiffs/Petitioner, including the right to any and all personalty belonging to Quaker Alloy, Inc.

such as [the Permit]."  (Id., at 3.)  Plaintiffs claim unspecified damages in excess of $1,000,000

and pray that the Department will "reinstate the bond and permit to Quaker Alloy, Inc. and be

enjoined from further acts in violation of federal law with regard to [the Permit]."  (Id., at 5-6.)

## II.    DISCUSSION

### A.    The Department's Motion to Remand (Doc. No. 6)

The Department advances four distinct grounds in support of its motion to remand the

action to the EHB:  (1) The notice of removal was untimely filed; (2) "Quaker Alloy, Inc." is

improperly named as a party to the action; (3) Plaintiffs filed the notice of removal in bad faith;

and (4) the EHB is not a "state court" and an appeal to the EHB is not a "civil action" for the

purposes of removal under 28 U.S.C. § 1452(a).  (Doc. No. 6, at 2-3.)  The Department adds a

fifth ground to the list via its brief in reply, namely, that Plaintiffs failed to timely file their brief

in opposition and, pursuant to Local Rule 7.6, the Court should grant its motion as unopposed.

(Doc. No. 17, at 7-11.)  See M.D. Pa. L.R. 7.6 ("Any respondent who fails to [timely file a

responsive brief] shall be deemed not to oppose such motion.").

Plaintiffs' brief in opposition—which was, in fact, untimely filed—is in large part

unresponsive, arguing from the premise that "[t]he only issue before this Court is the matter of a

governmental agency asserting claims against a good faith purchaser of property that were

required to be raised before a federal court of which they [sic] had notice should the agency

object or otherwise require such sale with conditions."  (Doc. No. 16, at 1.)  Following this

obliquity is a page-long quotation from Pennsylvania's Solid Waste Management Act (<u>id.</u>, at 2-3); a string of incredible factual contentions, such as "the Respondent admits that they enjoyed a biased administrative judge" in the EHB (<u>id.</u>, at 3) and "Respondent argues in their memorandum that the [EHB] is not a tribunal but an administrative governmental unit enforcing police powers in this matter that are criminal rather than civil in nature" (<u>id.</u>, at 4); vague intimations of federal questions lurking in the shadows—stating, for instance, that the Department's actions "appear to violate the commerce clause" or "appear to violate due process protections" (<u>id.</u>, at 4-5); and numerous impenetrable conclusions of law, of which the following is typical:

> Supremacy clause mandates that policy decision by Congress to subject all creditors including states to general presumption against postpetition [sic] additions, pursuant to its bankruptcy power, displace normal operation of state's statutory provision for additions to local property taxes for penalties accruing on delinquent property taxes after filing bankruptcy petition to extent latter command result contrary to federal statute; bankruptcy court's lack of power to address state tax liens would seriously impair its power to administer estate and promulgate reorganization plan.

(<u>Id.</u>, at 7.)  Finally, in three short paragraphs at the close of their brief, under the heading "The Notice Was Timely Filed," Plaintiffs confront the issue of timeliness:

> It is the fault of Respondent that a Petition for Removal was not filed within sixty days of the first appeal to the EHB, as the Respondent never afforded direct notice of the permit being revoked to Petitioner and refused to comply with discovery until April 2007.  As to the second appeal to the EHB, the DEP sent the notice to a trustee in Missouri rather than to the real party in interest, and this clearly evidences a lack of good faith which forbids DEP to raise a timeliness argument now on equitable grounds. . . . [I]t was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith.  DEP should not now benefit by their bad faith actions and inequitable conduct.

(Id., at 7-8.)  Notwithstanding the gravity of these claims, Plaintiffs cite no legal authority in their

support.  More remarkable still, there is not a single citation to the record—a 377-page jumble of

filings, letters, and instruments, some of which appear in duplicate and triplicate—anywhere in

their brief.  (See generally id.)  What is more, by omitting a counter statement of the facts,

Plaintiffs have effectively conceded the Department's version of the events preceding removal.

M.D. Pa. L.R. 7.8 ("If a counter statement of facts or questions involved are not filed, the

statements of the moving party will be deemed adopted.").  While these failings alone are cause

enough to grant the Department's motion, the Court will nevertheless examine the merits of

Plaintiffs' arguments.  See D'Angio v. Borough of Nescopeck, 56 F. Supp. 2d 502, 504

(M.D. Pa. 1999) ("A litigant who fails to press a point by supporting it with authority or by

showing why it is a good point despite a lack of authority . . . forfeits the point." (citations

omitted)); see also M.D. Pa. L.R. 7.8 ("Briefs shall contain complete citations of all authorities

relied upon . . . .").

According to the notice of removal, Plaintiffs relied upon 28 U.S.C. § 1452(a) and

Federal Rule of Bankruptcy Procedure 9027(a) in removing the appeals.  (Doc. No. 1, at 1-2.)

Section 1452(a) provides that a "party may remove any claim or cause of action in a civil action

other than a proceeding before the United States Tax Court or a civil action by a governmental

unit to enforce such governmental unit's police or regulatory power, to the district court for the

district where such civil action is pending, if such district court has jurisdiction . . . ."

28 U.S.C. § 1452(a).  Subsection 3 of Federal Rule of Bankruptcy Procedure 9027(a) prescribes

the time for filing a notice of removal:

> If a claim or cause of action is asserted in another court after the commencement of a case under the [Bankruptcy] Code, a notice of removal may be filed with the clerk [of court] only within the shorter of (A) 30 days after receipt, through service or otherwise, of a copy of the initial pleading setting forth the claim or cause of action sought to be removed, or (B) 30 days after receipt of the summons if the initial pleading has been filed with the court but not served with the summons."

Fed. R. Bankr. P. 9027(a)(3).  Under § 1452(b), a "court to which [a] claim or cause of action is removed may remand such claim or cause of action on any equitable ground."  28 U.S.C. § 1452(b).

Forgetting for a moment that Rule 9027(a)(3) speaks of courts, cases, pleadings, and defendants, and not boards, appeals, notices, or appellants, Plaintiffs in this case were required to file a notice of removal within thirty days of commencing their most recent appeal.  See Fed. R. Bankr. P. 9072(a)(3).  In fact, Plaintiffs filed the notice of removal on April 9, 2007, or, using the appeals as points of reference, 224, 140, and 91 days after commencing the Permit, Bond, and Order Appeals, respectively.  (See Doc. No. 1-5, at 6 (Permit Appeal commenced Aug. 28, 2006); id., at 12 (Bond Appeal commenced Nov. 20, 2006); id., at 21-22 (Order Appeal commenced Jan. 8, 2007).)  Thus, under the best of circumstances, the Clerk of Court received the notice two months too late.  Plaintiffs, however, as previously mentioned, fault the Department for the delay:  first, for providing "direct notice" of the permit revocation and bond forfeiture to the Trustee instead of "the real party in interest," i.e., the Plaintiffs, and, second, for "refus[ing] to comply with discovery until April 2007."  (Doc. No. 16, at 7-8.)  More particularly, Plaintiffs contend that "it was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith."  (Id., at 8.)

14

Whether or not the Department provided the Plaintiffs with actual notice of the permit revocation or bond forfeiture is completely inapposite to any equitable arguments Plaintiffs might now make.  Plaintiffs commenced their most recent appeal on January 8, 2007.  Under Rule 9072(3)(a), the parties had until February 7, 2007, to file notice of removing the appeal, actual notice or not.  Moreover, even if actual notice had some bearing upon the matter, which it does not, there is ample evidence that the Plaintiffs had constructive notice of the permit revocation well before the February 7, 2007, filing deadline.  (See, e.g., Doc. No. 1-8, at 22 (Letter dated December 13, 2006, from Edwards to Bohan addressing, inter alia, permit revocation).)  Indeed, Hanoverian unequivocally states in its notice of appeal filed August 28, 2006, that it "became aware of the revocation action from publication in the *Pennsylvania Bulletin*."  (Doc. No. 1-5, at 7; see also Doc. No. 1-8, at 5 (Bond Appeal filed November 20, 2006) ("Appellant . . . was indirectly advised of the bond forfeiture action within thirty days of the date of this appeal."); Doc. No. 1-5, at 22 (Order Appeal filed January 8, 2007) ("[T]he Appellee unlawfully, willfully, and deliberately commenced to revoke [the Permit] and forfeit the bond . . . .").)

As a matter of law, the Permit was not appurtenant to the Landfill or freely transferable. See 25 Pa. Code § 287.221(a) (2008) ("A transfer, assignment or sale of rights granted under a permit may not be made without obtaining permit reissuance."); 35 Pa. Cons. Stat. Ann. § 6018.610(9) (2007) ("It shall be unlawful for any person or municipality to . . . [c]ause or assist in the violation of . . . any order of the department or any term or condition of any permit.").  Sending notice by letter to the court-appointed Trustee in Missouri and the permittee Quaker Alloy, Inc. in Myerstown, Pennsylvania—its address of record—instead of Hanoverian, the Trust, Metzger, or the fictitious name "Quaker Alloy, Inc." does not therefore "clearly

evidence a lack of good faith," but rather an abundance of common sense and strict adherence to the state's environmental regulations.  (Doc. No. 16, at 8.)  <u>See</u> 25 Pa. Code § 287.422(b) (2008) (providing, exclusively, that "[t]he Department will publish in the *Pennsylvania Bulletin* notice of the revocation or suspension of a permit"); <u>cf. id.</u> § 287.414(a) (2008) (providing that service of civil penalty assessments "will be by registered or certified mail, or by personal service. . . . tendered at the address of that person set forth in the application for a permit").

Perhaps unsurprisingly, Plaintiffs' assertion that the Department "refused to comply with discovery until April 2007" finds not a shred of support in the record.  (Doc. No. 16, at 7-8.)  On the contrary, the record unambiguously shows that it was Plaintiffs, not the Department, that failed to comply with discovery.  To begin with, the Department, not Hanoverian, filed a motion to compel discovery with the EHB on November 11, 2006.  (Doc. No. 1-5; <u>see also</u> Doc. No. 1-4, at 36 (Docket for consolidated appeals).)  The following month, the EHB issued an order granting the Department's motion and directing Hanoverian "to serve full and complete answers to [the Department's] discovery requests on or before January 12, 2007."  (Doc. No. 1-8, at 16.)  On January 22, 2007, ten days after the discovery deadline had come and gone, the Department filed a motion for sanctions, exhaustively cataloguing Plaintiffs' numerous "discovery abuses."  (Doc. No. 1-5, at 44.)  The EHB eventually dismissed the motion as moot, having brokered a revised discovery schedule.  (<u>Id.</u>, at 3.)  To conclude, nowhere in the record is there the slightest indication that the Department in any way delayed or refused to comply with discovery.  Having found that the notice of removal was untimely filed, the Court need not consider the Department's other grounds for remand.  The Court will grant the motion to remand.

### B.    Motion for Sanctions

In its motion for sanctions, the Department seeks an order directing Litman, the law firm of Edwards and Litman, and Plaintiffs to reimburse the Department for its reasonable expenses, including attorney's fees, and imposing any other sanctions that the Court might deem appropriate under Federal Rule of Civil Procedure 11 and Federal Rule of Bankruptcy Procedure 9011(b).  (Doc. No. 20, at 1-2.)  Rule 11 provides in relevant part that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

Fed. R. Civ. P. 11(b)(1)–(3).  Rule 11 further provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Id. 11(c)(1).  The rule therefore not only protects against a party presenting a paper for an improper purpose, but "imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing."  Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc., 999 F.2d 745, 751

(3d Cir. 1993).  In short, the rule cautions litigants "to look before leaping."  <u>Lieb v. Topstone</u>

<u>Indus., Inc.</u>, 788 F.2d 151, 157 (3d Cir. 1986); <u>see also</u> <u>Thornton v. Wahl</u>, 787 F.2d 1151, 1154

(7th Cir. 1986) ("The point . . . is that every lawyer must do the necessary work to find the law

*before* filing the brief.").  Because the Federal Rules of Bankruptcy Procedure govern procedure

in courts of bankruptcy exclusively, the Court will disregard Defendant's arguments predicated

thereupon, Rule 9011(b) included.  <u>See generally</u> Fed. R. Bankr. P. 1001.

The Third Circuit has consistently held that, in scrutinizing a paper against the

requirements of Rule 11, "courts must apply an objective standard of reasonableness under the

circumstances."  <u>Mary Ann Pensiero, Inc. v. Lingle</u>, 847 F.2d 90, 94 (3d Cir. 1988); <u>see also</u>

<u>Bradgate Assocs., Inc.</u>, 999 F.2d at 752; <u>Lieb</u>, 788 F.2d at 157.  Thus, when examining the

sufficiency of an attorney's investigation of facts and law, courts are "expected to avoid the

wisdom of hindsight and . . . test the signer's conduct by inquiring what was reasonable to

believe at the time the pleading, motion, or other paper was submitted."  <u>CTC Imports and Exps.</u>

<u>v. Nigerian Petroleum Corp.</u>, 951 F.2d 573, 578 (3d Cir. 1991) (citation omitted).

"Notwithstanding the emphasis on the time of initial submission, however, parties will not be

entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's

standard before a later filing."  <u>Gaiardo v. Ethyl Corp.</u>, 835 F.2d 479, 484 (3d Cir. 1987).  And

neither may the parties "escape liability because [they] did not intend to bring about additional

delay or expense."  <u>Lieb</u>, 788 F.2d at 157.

According to the Third Circuit, what constitutes a reasonable inquiry may depend on such

factors as:  (1) the amount of time available to the signer for conducting a factual and legal

investigation; (2) the necessity of relying on a client for the underlying factual information; (3)

18

the plausibility of the legal position advocated; (4) the complexity of the legal and factual issues implicated;  (5) whether the signer depended on forwarding counsel or another member of the bar; and (6) whether the signer was in a position to know or acquire the relevant factual details. See CTC Imports and Exps., 951 F.2d at 578; Lingle, 847 F.2d at 95; Colburn v. Upper Darby Twp., 838 F.2d 663, 667 (3d Cir.), cert. denied 489 U.S. 1065 (1988).  Above all else, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified."  Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).

In its brief in support, the Department argues that, "[h]ad Litman conducted a reasonable inquiry into the legal contentions and evidentiary support in the Notice of Removal, he would have known that removal was improper."  (Doc. No. 21, at 4.)  "Furthermore," it contends, "the totality of the circumstances surrounding the Notice of Removal show that it was filed for an improper purpose."  (Id., at 5.)  What follows is a lengthy but non-exhaustive list of Litman's transgressions, meticulously supported by citations to existing law and the record.  Regarding Litman's legal contentions, the Department claims that a reasonable inquiry would have revealed, first, that the appeals were not "civil actions" for the purpose of 28 U.S.C. § 1452(a) and therefore not removable under § 1441 and, second, that, even if they were, the opportunity for removal under Rule 9027(a)(3) had long since evaporated by the time Litman filed the notice. (Id., at 14-19.)  Regarding Litman's factual contentions, the Department likewise asserts that a reasonable inquiry would have revealed a lack of evidentiary support for his contentions that: (1) Quaker Alloy, Inc. is properly named as a party to the instant action; (2) the Bankruptcy Court authorized the sale of the "corporate entity" that owned and operated the Landfill under the

Permit; (3) the "Trustee sold all right, title, and interest [in] the corporate entity Quaker Alloy, Inc. to the [Plaintiffs], including the rights to any and all personalty belonging to Quaker Alloy, Inc. such as [the Permit]"; (4) each of the Plaintiffs is incorporated in and has a principal place of business in a state other than Pennsylvania; and (5) that "Quaker Alloy Fire [sic] [had] provided written notice of [the] Notice of Removal to counsel of record for all parties and [that] a true and complete copy of [the] Notice of removal [had] been filed in the State Court [sic] Action" prior to April 2, 2007.  (Id., at 19-25 (citing Doc. Nos. 1, 1-2).)

Finally, the Department marshals considerable evidence in support of its contention that "the Notice of Removal was not merely ill-conceived, but was deliberately crafted to mislead the Court and harass the Department."  (Id., at 25.)  Such evidence includes not only the foregoing legal and factual contentions, but record proof that:  (1) of the named plaintiffs, only Hanoverian appealed the permit revocation or the bond forfeiture; (2) Litman used the phrase "Quaker Alloy" as a "shorthand" for Plaintiffs in the notice of removal whenever he wished to "imply[] that [the Landfill's] previous owner, a debtor in bankruptcy proceeding, is a party to the EHB proceedings," but "where confusion between his clients and the previous owner might potentially hurt his clients, Litman was careful to refer to his clients as 'Petitioner' or 'Plaintiffs,' rather than 'Quaker Alloy'"; (3) the damages to Plaintiffs could not have been "in excess of $1,000,000," as claimed in the notice of removal; and (4) Litman refused to withdraw or amend his papers even after the Department had belied his various "misrepresentations and obfuscations" and twice advised him by letter of its intention to file a motion for sanctions unless he withdrew the notice of removal.  (Id., at 25-28 (citing Doc. Nos. 1, 1-2); see also Doc. No. 9, at 25-27; Doc. No. 9-25, at 7; id., at 10.)

In a brief in opposition filed ten days late, Litman sidesteps the Department's arguments and accuses the movant of "corruption, mismanagement, and extortion," alleging that, "[d]espite reasonable efforts to set a bond that would be appropriate under the circumstances, [the Department] surreptitiously tried to steal Petitioners' existing bond and extort money to allow the sale to proceed in a common scheme of government corruption." (Doc. No. 27, at 1-2.)  The Department, he contends, "now seeks to sanction a property owner, Hanoverian Inc. dba Quaker Alloy, Inc., and beneficial owners of the property, for buying a bankrupt company and all of its assets including its landfill and associated permits under a federal court Order, which saved DEP from a catastrophe arising from their incompetence and mismanagement of the solid residual waste rules governing a foundry sand captive landfill." (Id., at 3.)  On a related note, Litman vilifies the Department for "striving to destroy the Pennsylvania Foundry Industry" and "depress[ing] the industry while at the same time foreign industry was invading the United States." (Id.)

After a digressive account of Atchison's collapse, Litman trains his invective on the Department's employees:

> Clearly, rouge [sic] employees of [the Department] have set upon themselves the task to violate their obligation to serve the Commonwealth of Pennsylvania with fidelity and instead further their objective of a corrupt scheme to act contrary to federal court orders and agency policy, by extorting unreasonable sums of money through surreptitious notices designed to hide so-called lawful permit revocations, misdirected notices of bond forfeitures designed to avoid timely contest, and administrative orders to trust beneficiaries and other non-sensical entities designed to intimidate and coerse [sic] the payment of money into a [Department] fund used for other unlawful activities.  The rouge [sic] employees of [the Department] have engaged in a corrupt enterprise with such magnitude that they have opened themselves up to personal liability.

(Id., at 8-9.)  Litman casts aspersions upon the EHB as well, which he repeatedly refers to as a

"state court":  "If this court should remand this case to a state court whose record in this case

evidences bias in favor of the agency involved, then any state agency can disobey federal court

orders and be not subject to federal court scrutiny for such blatant misconduct."  (Id., at 14.)  In

Litman's view, it is the Department "who are in contempt of court and should be sanctioned not

only for filing such frivolous motions, but also to seek relief under Rule 11 to further disguise

their real objective—corrupt and/or inept government agency cover-up of their misconduct and

mismanagement."  (Id., at 15; see also Doc. No. 26, at 2 ("[P]etitioners [sic] allegations are not

baseless . . . it is Defendant's instant motion that is baseless . . . .").)  Support for this contention

consists of a two-page quotation from the Pennsylvania General Assembly's findings of facts for

the state's Corrupt Organizations Act and the argument that "[j]ust because the statutory crime of

bribery, under former 18 P[a]. [Cons.] S[tat]. § 4303 . . . , does not proscribe the same conduct as

the common law offense of misfeasance, malfeasance, and nonfeasance in office, does not mean

that [the Department] is not guilty of corruption and they [sic] who should be sanctioned."

(Doc. No. 27, at 12-13, 15 (citing Commonwealth v. Dolny, 342 A.2d 399 (Pa. Super. Ct.

1975)).)  Plaintiffs sought removal, Litman explains, "to address the overwhelming atrocities

being done by [the Department] to engage [sic] in a scheme to commit extortion from

Petitioners."  (Id., at 11.)

 Consistent with his previous filings, Litman has not given his brief the benefit of even

one citation to the record.  However, rather than retreat from his previous positions, he persists in

advancing factual contentions that are entirely lacking in evidentiary support and, more often

than not, clearly contradicted by the record.  Most egregious among these are the contentions

that:  (1) the "federal court was motioned [sic] to allow the sale, including the 'permitted

landfill,'"; (2) the Department "did not require a pre-sale approval of the landfill permit, nor did

they contest the sale of the permit and all of Quaker Alloy's assets to Atchison in 1991"; (3) "[i]n

2003-2004 [Bankruptcy] Judge Venters granted motions to sell the permitted landfill and sell the

corporation's identity to Petitioners"; (4) the Department "allow[ed] the permit and landfill to be

sold under federal court order without doing anything to place conditions upon its transfer"; and

(5) the Department "chose to ignore all Court notices and after transfer to Hanoverian, Inc.

improperly and untimely raised claims that were required to be asserted before the sale."  (Id.,

at 4, 5, 6, 7.)  Likewise, Litman clings to legal contentions that are both frivolous and

unwarranted, such as the contentions that:  (1) "Atchison owned and operated the landfill under

its tradename wholly owned subsidiary—Quaker Alloy, Inc."; (2) "[s]ince 1991 Atchison was the

owner and operator of the landfill, but it's [sic] permit remained in the tradename of Quaker

Alloy, Inc."; (3) Plaintiffs are "protected good faith purchasers free and clear of the claims of [the

Department]"; (4) "[t]hroughout the entire process the permit has been in the name of Quaker

Alloy, Inc., but the parent company over Quaker Alloy, Inc. has changed"; (5) "[o]nce the

bankruptcy proceeding was begun [sic], [the Department] should have sought a secured claim

against the landfill"; and (6) Quaker Alloy, Inc. is properly named as a party to the instant action.

(Id., at 1, 4, 5.)

With regard to this last point, Litman's continued insistence that the fictitious name

"Quaker Alloy, Inc." was and is the permittee or that it can rightly count itself amongst the

Plaintiffs is not only surreal, it is a gross misrepresentation of existing law.  See

23

Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in

interest.");17 James Wm. Moore et al., Moore's Federal Practice § 10.02[2][c] (3d ed. 2007)

("A corporation or other entity will not be permitted to proceed under a pseudonym, but must sue

under its own name as the real party in interest.").  Furthermore, the underlying contention that

"Petitioners" somehow purchased Quaker Alloy's "corporate identity" hardly qualifies as the sort

of "nonfrivolous argument for extending, modifying, or reversing existing law or for establishing

new law" contemplated by Rule 11, novelty notwithstanding.  (Doc. No. 16, at 4; Doc. No. 27,

at 4, 5.)  See Thornton v. Wahl, 787 F.2d 1151, 1154 (7th Cir. 1986) ("It is not acceptable to

make an assertion of law and hope that it will turn out to be true.").

        As with his prior filings, Litman's failure to cite the record "has required the court to

engage in the type of circuitous research and fact-finding that the United States Court of Appeals

for the Third Circuit has repeatedly deemed unnecessary and taxing on judicial resources." Ober

v. Miller, No. 04-CV-1669, 2007 WL 4443256, at *1 n.2 (M.D. Pa. Dec. 18, 2007) (citing

Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006)).  In addition, while

"[m]inor grammatical errors are inevitable," id., even the most cursory examination of Plaintiffs'

brief reveals a troubling disregard for both the basic rules of grammar and the needs of the

average reader, as typified by the following sentence:  "Coercion and extortion by [the

Department] to post-federal court order seeking money from Petitioners in the guise of inordinate

bonding requirements never before sought in order to address [the Department's] fraud upon the

public perpetrated over years before of having set bonding for the landfill adequate for closure

costs at the time it was initially built," (Doc. No. 27, at 14.)  See M.D. Pa. L.R. 83.23.2 (adopting

the Pennsylvania Rules of Professional Conduct); Pa. R. Prof'l Conduct R. 1.1 ("Competent

24

representation requires the legal knowledge, skill, thoroughness and preparation reasonably
necessary for the representation.").

In its brief in reply, the Department, after marveling at the "sheer volume of falsehoods
and scandalous matter squeezed into Plaintiffs' [brief]," surmises that the "most striking aspect
of Plaintiffs' filings—even in the short time that this matter has been before this Court—is the
frequency, nonchalance, and sheer audacity with which they have misrepresented central facts to
the Court . . . and the depths to which Litman has dug in his heels when confronted with
misrepresentations."  (Doc. No. 28, at 19, 23.)  "What we have here," the Department concludes,
"are not mere 'mistakes' but rather a pattern of deliberate misrepresentation used as a litigation
tool."  (Id., at 23.)  Suffice to say, the Court wholeheartedly agrees.

Like all litigants, Litman had "an affirmative duty to conduct a reasonable inquiry into the
facts and law" before filing papers in this Court.  Bradgate Assocs., Inc. v. Fellows, Read &
Assocs., Inc., 999 F.2d 745, 751 (3d Cir. 1993).  Had he done so, he most certainly would have
learned that the lion's share of his legal and factual contentions had no basis in either existing
law or the evidence, respectively.  There are no mitigating factors at play:  Litman had ample
time—224 days between commencing the Permit Appeal and filing the notice of removal—in
which to conduct a factual and legal investigation; he relied upon his client for only a small
fraction of the underlying factual information, all of it undisputed; the issues at bar are not
especially complex; he was the sole signatory to all papers and, one may reasonably infer, did not
depend upon another attorney in their preparation; and he, more than anyone else, was in an ideal
position to know and acquire the relevant factual details.  See CTC Imports and Exps. v.
Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991); Mary Ann Pensiero, Inc. v. Lingle,

847 F.2d 90, 95 (3d Cir. 1988); Colburn v. Upper Darby Twp., 838 F.2d 663, 667 (3d Cir.), cert.

denied 489 U.S. 1065 (1988).  Furthermore, Litman had ample opportunity to amend or

withdraw his filings after the Department apprised him of his errors, something it did on repeated

occasions.  See Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987) ("[P]arties will not be

entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's

standard before a later filing.").

Whether intentionally or not—and the Court has no reason to believe that Litman's

conduct was anything but intentional—Litman has unnecessarily delayed and needlessly

increased the cost of litigation for the Department and, by extension, the citizens of the

Commonwealth.  Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986) ("The pleader

may not escape liability because he did not intend to bring about additional delay or expense.").

He has practiced a fraud upon the Court, from his first filing to his last.  Nowhere is that fraud

more pronounced than in the notice of removal itself, which absent its falsehoods, half-truths,

and distortions, would have given the Court ample cause to remand the action of its own accord

pursuant 28 U.S.C. § 1447.  See 28 U.S.C. § 1447 ("If at any time before final judgment it

appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

"In this regard, if a court finds 'that fraud has been practiced upon it . . . ,' it may assess

attorney's fees against the responsible party, as it may when a party 'shows bad faith by delaying

or disrupting the litigation or by hampering enforcement of a court order.'"  Chambers v.

NASCO, Inc., 501 U.S. 32, 46 (1991) (citing Universal Oil Prods. Co. v. Root Ref. Co.,

328 U.S. 575, 580 (1946); Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)).

Rule 11 authorizes district courts to sanction litigants by issuing "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from [a] violation" of the rule.  Fed. R. Civ. P. 11(c)(4); see also 28 U.S.C. § 1447 ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."); M.D. Pa. L.R. 83.3.1 ("[A] judge may . . . assess reasonable costs directly against counsel whose action has obstructed the effective administration of the court's business, or suspend counsel from practicing in this court for a specified period of time not exceeding six (6) months.").  Rule 11's "reasonableness requirement by its nature hinges on the particular facts and circumstances presented in a given case and looks not only to the hours and billing rate involved in responding to the other party's sanctionable conduct, but also to the appropriateness of the response taken."  Dubisky v. Owens, 849 F.2d 1034, 1037 (7th Cir. 1988).  In calculating an award, district courts must "consider various mitigating factors," including the sanctioned party's ability to pay, the sanctioned party's "good reputation," whether the violation was to some extent non-frivolous, and whether the violation was in any way unintentional.  Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195-196, 197 and 197 n.6 (3d Cir. 1988).  Speaking of sanctions generally, the Third Circuit has stated:  "Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object."  Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).

"The starting point for a determination of attorney's fees, the lodestar calculation, is the product of the number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." Doering, 857 F.2d at 195.  In this case, the Department has provided the Court with a detailed accounting of its attorney's fees directly resulting from Litman's violations.  As of April 30, 2007, Bohan had expended 107.7 hours of his time in preparing the motion for remand, the motion for sanctions, and the various briefs and letters in support of those motions.  (Doc. No. 9-25, at 2-4; Doc. No. 21-25, at 13; Doc. No. 28-8, at 3.)  As a state attorney, Bohan's hourly rate of $51.58 is significantly lower than the prevailing market rate and manyfold lower than Litman's own rate of $200 to $350. (Doc. No. 9-25, at 5.)  See Avvo Profile for Donald Litman, http://www.avvo.com/attorneys/18951-pa-donald-litman-716667.html (last visited Mar. 25, 2008).[1]  In the final analysis, Litman's conduct cost the Department $5,555.17 in attorney's fees, an amount that strikes the Court as eminently reasonable under the circumstances.  This seems especially so given the Third Circuit's stated position that there is "no difference between the situation of an Assistant U.S. Attorney and that of a public interest lawyer whose services, the Supreme Court has held, are to be valued at a market rate, even though he or she, like Assistant U.S. Attorneys, had no regular billing rate." Napier v. Thirty or More Unidentified Fed. Agents, 855 F.2d 1080, 1092 (3d Cir. 1988) (citing Blum v. Stenson, 465 U.S. 886, 895 (1984) (holding

---

[1] Since Litman himself has claimed and verified his Avvo profile, the Court regards his profile as "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and, therefore, justly noticed.  Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

"that the district court did not abuse its discretion by awarding the government's attorney $100 per hour" on the basis of then prevailing market rates); see also Hamer v. Lake County, 819 F.2d 1362, 1371 (7th Cir. 1987) (affirming district court's decision to award state's attorney $85 per hour).  Had Litman brought any mitigating factors to the Court's attention, it would certainly consider them; Litman, however, did not.

The Court is particularly mindful of the Supreme Court's admonition that "[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record."  Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767 (1980). Here, Litman was given fair notice and an opportunity to respond, but elected to squander that opportunity by devoting his brief to scandalous and immaterial allegations rather than responsive arguments in his defense.  Indeed, in so doing, Litman effectively conceded the Department's motion.  Cf. Beazer East, Inc. v. Mead Corp., 412 F.3d 429, 437 n.11 (3d Cir. 2005) (An appellee "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [appellant]." (citation omitted)); see also Williams v. Savage, No. 07-0583, — F. Supp. 2d —, 2008 WL 628003, at *5 (D.D.C. Mar. 10, 2008) ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (citation omitted)).

There is nothing in the record to indicate that Metzger, either individually or in his capacity as Hanoverian's president, bears any responsibility for Litman's conduct in these proceedings.  Ordinarily, "if an attorney, rather than a client, is at fault, the sanction should . . . target the culpable attorney."  Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).  The Court will therefore deny the Department's motion for

sanctions with respect to Metzger, Hanoverian, and the Trust.  Rule 11, however, provides that

"[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation

committed by its partner, associate, or employee."  Fed. R. Civ. P. 11(c)(1).  Litman has not pled

any such circumstances.  Accordingly, the Court will grant the Department's motion with respect

to Litman and the law firm of Litman and Edwards, imposing a monetary sanction of $5,555.17

payable to the Department not less than sixty (60) days from the date of the accompanying order.